[No. 21284.   *En Banc.*   May 29, 1929.]

THE STATE OF WASHINGTON, *Respondent*, v. ANTONIA SUSAN, *Appellant.*[1]

[1]Reported in 278 Pac. 149.

366

*Wesley Lloyd* and *G. C. Nolte,* for appellant.

*Geo. O. Beardsley,* for respondent.

BEALS, J.—Prior to August, 1927, Frank Susan and his family were residing on a farm about two and one-half miles north of the town of Kennewick in Benton county. The family consisted of Frank Susan, the deceased; his wife, Antonia Susan, fifty-three years of age, the defendant; their married daughter, Annie Posick, seventeen years of age, and her new-born babe; Annie's husband, Frank Posick; and Frank Susan, junior, the twelve-year-old son of Frank Susan and the defendant.

The Susans were Croatians, who came to the United States as man and wife in 1901. After living some time in the city of Tacoma, where the defendant operated a boarding house while her husband worked on the railroad, and soon after Annie Susan was married to Frank Posick, the two families, who had accumulated some money by dint of hard work and their instinct to save, about March 1, 1927, jointly purchased the Benton county farm, which was valued at approximately $12,500. The title to the farm was taken in the name of Frank Posick, who explained that he had made a will to protect the one-half interest of his parents-in-law in the farm. Mr. and Mrs. Susan, having immigrated to America after they were grown,

never learned to understand or speak English easily or fluently, although Mrs. Susan probably understands common words concerning the usual occurrences of her daily life and expresses herself in English concerning the same with some degree of facility.

At the outset, we may say that a reading of the record—and in view of the importance of the case, we have discarded the abstract and read the transcript of the testimony as contained in the statement of facts —satisfies us that Mrs. Antonia Susan is an ignorant woman, of a rather low order of mentality, capable of, and accustomed to, much hard physical labor, a woman whose mind does not quickly assimilate or respond to ideas or conditions outside of the life of drudgery and toil to which she was brought up in her Croatian home and which she followed, with some mitigation, due rather to conditions necessarily imposed by living in the United States, than to any particular desire on her part, up to the date of her arrest charged with her husband's murder.

About six o'clock in the morning, August 5, 1927, Frank Susan was found, badly injured, lying in a small irrigation ditch on his farm, some distance from the house occupied by the family. He was alive, and feebly trying to extricate himself from the excavation into which he had fallen. Help was summoned, and Mr. Susan removed to his house, where he died before the close of the day. An autopsy demonstrated that the cause of his death was hemorrhage of the brain resulting from a hard blow from a blunt instrument on the bony mastoid process of the left ear.

August 30 following, an information was filed by the prosecuting attorney of Benton county, charging defendant with the crime of murder in the first degree. Her trial resulted in a verdict of guilty, the jury recommending that the death penalty be not inflicted.

From judgment entered on the verdict, and a sentence of life imprisonment, defendant appeals.

Appellant has moved to strike respondent's brief. In our opinion, the motion is without merit and the same is denied.

The state introduced a large amount of circumstantial evidence, including testimony as to alleged incriminating and conflicting statements made by appellant, tending to prove appellant guilty of the crime with which she stands charged. There was also some testimony as to possible motives which might have induced appellant to murder her husband. The record discloses evidence on the part of the state sufficient, if believed by the jury, to support a verdict of guilty of the crime charged in the information.

A brief statement of the facts disclosed by the testimony is necessary to a proper understanding of the questions to be determined on this appeal. Frank Susan, the deceased, was at times addicted to the excessive use of intoxicating liquor. He had been drinking heavily for a few days prior to his death, and had been sleeping in the field practically on the ground, some of the new-mown hay forming a mattress, and an old overcoat serving as a coverlet. During a portion, at least, of the night he received the injury which caused his death, the horses used on the farm were loose in and about this field. Shortly after Mr. Susan's death, appellant, together with Frank and Annie Posick, were arrested, the two latter being, after appellant was informed against, upon application of the prosecuting attorney, detained under bond, by order of the court, as material witnesses for the state. The evidence indicated that there had been some ill feeling between Mr. Susan and his son-in-law, Frank Posick, and also some slight friction between Mr. Susan and

a neighbor with whom there was a disagreement over some water rights.

Horseshoes were removed from the hind hoofs of one of the horses belonging to the Susans, and the state introduced testimony to the effect that the wound on Frank Susan's head had not been made by these horseshoes, as the marks on the head of the deceased did not correspond in size or shape with any part of the horseshoes. Whether the fore hoofs of the horses were shod at all, and whether the deceased might not have been struck by the fore hoof of one of the horses or by the front of one of the rear hoofs, does not clearly appear from the evidence.

At the trial, appellant was examined in the presence of the court as to her comprehension of the English language and her ability to express herself therein. After this examination, the court ordered the swearing of an interpreter, through whom appellant testified.

Appellant assigns error upon the refusal of the trial court to permit appellant's counsel to privately interview the witnesses Frank and Annie Posick, and in refusing to reduce the amount of bail demanded of these witnesses, in permitting counsel for the state to propound questions which appellant contends were leading, in receiving alleged improper evidence on rebuttal, in refusing to discharge the jury and declare a mistrial on account of misconduct of counsel for the state, in hearing defendant's motion for a new trial in the absence of counsel and upon alleged insufficient notice, in overruling this motion and rendering judgment on the verdict of the jury and in sentencing appellant thereon. Other errors are assigned which, in view of our conclusion upon some of those referred to, need not be discussed.

Appellant's counsel applied to the court for leave to interview Frank and Annie Posick, which leave the

court granted upon the condition that counsel for the state be present during the interview. The interview was had under these circumstances, a stenographer in the employ of the state being present to take down the statements made. At the conclusion of the conference, appellant's counsel requested the reporter to prepare, at appellant's expense, a transcript of the testimony, at which time counsel for the state remarked that he did not know whether or not he would furnish appellant's counsel with such a copy. No copy was furnished appellant's counsel prior to the trial, and during the trial, request was made for one, which request was refused by the prosecuting attorney. On application to the court by appellant's counsel for an order requiring counsel for the state to deliver such copy to appellant, the court refused to make such an order, upon which ruling appellant bases one of her claims of error.

■ It appears that appellant's counsel was afforded an opportunity to talk to Annie Posick in the absence of any third party, but no such opportunity was accorded them in so far as Frank Posick is concerned. It must be remembered that Frank Posick was not charged with any crime. He was detained as a material witness for the state, and, failing to furnish the amount of bail required, was confined in the county jail. In the first instance, the witness had been arrested as under suspicion of having committed, or been an accessory to, the murder of Mr. Susan, and from the record before us, assuming that a murder was committed, there was certainly adequate reason for detaining both Frank Posick and appellant pending investigation. Mr. Posick was detained as a witness for the state, and testified at the trial as such witness against appellant.

Counsel for respondent argues that, as no limitation

was placed by the court upon the number of times appellant's counsel could interview Frank Posick, the only restriction being that they could not interview him in the absence of counsel for the state, and that, as appellant's counsel sought only one opportunity to interview the witness, and as appellant fails to point out any evidence she could have procured had her counsel been permitted to examine the witness privately, appellant fails to show any prejudice resulting from the order of the court as made.

In this connection, we may state, in passing, that no error was committed by the trial court in refusing to reduce the amount of bail fixed as security for the attendance of Mr. and Mrs. Posick as witnesses. We do not find that the Posicks made any complaint on this point, and as to this matter, we find no error in the record of which appellant can complain.

In the case of *State v. Storrs,* 112 Wash. 675, 192 Pac. 984, 197 Pac. 17, this court laid down the rule that the matter of allowing counsel for a defendant charged with crime to interview persons who it is anticipated will be called as witnesses for the prosecution, rests largely within the discretion of the court, and that the action of the trial court will be considered ground for reversal only in case of an abuse of discretion. In the *Storrs* case, the witness sought to be interviewed was confined in the insane ward of the state penitentiary. This court noted the fact that the witness had been, and still was, in love with the defendant, who had great influence over her and who was charged with her seduction. It was properly concluded that no abuse of discretion had been shown.

In the case of *State v. Gaines,* 144 Wash. 446, 258 Pac. 508, it was held that, even though the trial court abused its discretion in refusing to allow defendant's counsel to privately interview a witness for the state,

this could not be held to be reversible error unless resulting prejudice was shown.

In view of these decisions, it cannot be held that the action of the trial court in refusing to allow appellant's counsel to interview Frank Posick privately, constitutes reversible error. We desire, however, to express our disapproval of the action of the trial court in refusing such permission. An entirely different question was presented in the case of *State v. Storrs, supra,* as in that case, the witness had been adjudged mentally deficient and was to an extraordinary degree under the control and domination of the defendant. Generally speaking, a person under detention as a witness for the state should not in any sense be sequestered. His detention is merely for the purpose of insuring his presence at the trial. He is not charged with crime. He is an unfortunate victim of the necessity under which the state rests for securing the preservation of its evidence. Under ordinary circumstances, such persons should be subjected to no further disabilities or inconvenience than the exigencies of the occasion absolutely require. Neither should persons who desire to talk to him be subjected to limitations or embarrassment.

The witness should be placed as nearly as possible in the same condition as he would be if unrestrained. A witness who is not placed under bond, or who is so placed and gives bail, is free to talk to anyone he wishes. It is hard to see why the fact that the witness fails, or is unable, to give bond, should subject either the witness or anyone else to unusual conditions in discussing facts concerning the trial in which it is understood that the person detained will be a witness for the prosecution. Certainly, if a witness who is laboring under no mental disability, and who is not peculiarly under the mental control or domination

of the party who seeks the interview, can be sequestered by being put under a large bond, and can only be interviewed in the presence of the prosecuting attorney, the door is open to grave abuses which, in our opinion, are not contemplated by the necessary law which provides that persons deemed by the state to be material witnesses on its behalf may be detained unless reasonable security for their presence at the trial is provided. We have discussed this matter somewhat at length in view of the importance of the question involved, though we find no reversible error in the action of the court in the case at bar.

Appellant bases her next claim of error upon certain questions propounded by counsel for the state to a witness for the prosecution, which questions appellant's counsel contend are leading. These questions directed the attention of the witness, without suggestion of any answer, to specific matters concerning conversations between the witness and appellant. The following are fair samples of the questions which were propounded: "What, if anything, did she say with reference to the garage?" "What, if anything, did she say with reference to a railroad pass?" The witness to whom these questions and others of similar tenor were propounded, was testifying at length concerning conversations between appellant and himself. The questions were objected to on the ground that they were leading. This objection is not well taken. The questions were directory only, and the trial court, in the exercise of that discretion necessarily vested in it as to the manner in which a long and arduous trial shall be conducted, committed no error in overruling appellant's objection to the form of the questions.

A more serious question is presented by appellant's assignment of error based upon certain testimony which the court permitted the state to in-

troduce on rebuttal. Appellant took the stand as a witness on her own behalf, and testified at considerable length. On cross-examination, counsel for the state laid the foundation for an alleged impeachment by propounding to appellant questions indicating that, on rebuttal, the state would offer testimony to the effect that appellant had formerly made statements at variance with her testimony on the stand. She denied making such statements, and, on rebuttal, counsel for the state recalled as a witness Mr. C. E. Duffy, a police officer of the town of Kennewick. Mr. Duffy had testified, on direct examination, as part of the state's case in chief, in reply to questions by the prosecuting attorney, that he, together with the prosecuting attorney, quizzed appellant concerning her husband's death for "probably in all I would say, five, or six, or seven hours, something like that." On being recalled by the state on rebuttal, the witness testified as follows:

"Q. (MR. BEARDSLEY) Mr. Duffy, were you present in your office at the police station in Kennewick on August 18th at the time I questioned Mrs. Susan? A. Yes. Q. In my presence and at this particular time also in the presence of Frank Posick? A. Yes. Q. I will ask you whether or not the following questions were asked of the defendant and by her answered as follows: 'What did you tell Frank to go out and turn the horses loose for?' 'The dogs bark, sure.' A. Yes. MR. LLOYD: That is objected to upon the ground that there is nothing to impeach. The witness has made no denial. She has said that on account of her condition she does not know what she said. THE COURT: Objection overruled. MR. LLOYD: Exception. Q. I will ask you if at the same time and place the following question was propounded to Mrs. Susan, to which she made the following answer: 'What time in the morning was it when you told him the dogs were barking?' 'I not look at the time before he get up.' A. That is correct. Q. I will ask you whether the following questions and answers were not made at the same time and place?

'About four o'clock in the morning, wasn't it?' 'No, sir.' 'If I were you I would think about that' 'Yes, I killed my husband.' MR. LLOYD: That is not the ground for an impeaching question. The impeaching question included another question and answer. MR. BEARDSLEY: No, it did not. THE COURT: Objection overruled. A. That is correct. Q. I will ask you whether the following statement was not made by the defendant at the same time and place before the same parties: 'I might go free. You say I kill my man. That is all right. I kill my man with a big knife.' A. That is correct. Q. I will ask you whether the following statement was not made at the same time and place by the defendant Mrs. Susan: 'You say horses no kill; I kill. Well, I kill, that is all.' A. That is correct. Q. Now Mr. Duffy, on the 5th of August 1927 at your office at the police station in Kennewick in the presence of myself, Mr. McGee and Mr. Shepherd and Mr. Swanner, did I propound the following question to Mrs. Susan, to which she made the following answer: 'Did your husband and your son-in-law have any trouble?' 'No, they did not.' 'They got along all right?' 'Yes.' A. That is correct. MR. BEARDSLEY: That is all. The state rests."

On cross-examination by counsel for the state, appellant had stated, through the interpreter, in response to questions as to whether or not she had made certain statements to the prosecuting attorney and Mr. Duffy, that, when she was quizzed at the police station, "she was badly mixed up and the people mixed her up a little worse and she don't know." She denied making certain statements, but in response to further questions as to whether or not she had made other statements, she replied that she did not know what she said.

It is not even suggested that Frank Susan was killed with a knife or any sharp instrument. The testimony is clear that he received the blow which caused his death from a blunt instrument. Appellant, a woman of middle age, poorly educated, of feeble intelligence, laboring to understand and express herself in a language

which was, to her, foreign, answering questions made up of words with which she was probably to some extent unfamiliar, questioned persistently for five, six or seven hours, is said to have exclaimed

"I might go free, you say I kill my man. That is all right. I kill my man with a big knife," and later "You say horses no kill, I kill. Well, I kill. That is all." If it was believed that these statements constituted a confession on the part of appellant, they should have been offered as part of the state's case in chief. As to the admissibility of these statements of appellant on rebuttal, it must be remembered that appellant had not definitely denied making the same. She answered on cross-examination as to what statements she had made, that she did not know what she had said. In our opinion the testimony referred to was improperly received and, coming just at the close of the case, was prejudicial in the extreme.

The statements which it was testified were made by appellant were manifestly not a confession, and the state did not offer them as such. The probative value of such exclamations, made by a person of appellant's mentality and education, at the close of a six-hour examination concerning the death and probable murder of her husband, is practically nothing. If the statements made had led to the discovery of any other evidence supporting or corroborating what appellant had said and tending to prove her guilt, an entirely different question would be presented, but such was not the case, the testimony as to the words uttered by appellant having been received simply to prove that she had said certain things. The prosecuting attorney was right in subjecting appellant to a searching examination as to all the circumstances surrounding Mr. Susan's death, and it does not appear that, in the course of the investigation, any unfair advantage of

appellant was taken or attempted, but it was unfair and unjust to introduce testimony as to exclamatory remarks made by appellant, after hours of answering questions concerning the facts surrounding her husband's death, and suggestions or intimations that she was guilty of his murder.

It is true, as argued by counsel for respondent, that there is authority to the effect that proof may be offered as to statements made by a witness if the making of the statement is denied, if the witness states that he does not remember having made it, or neither affirms nor denies having done so. Vol. 2, Bancroft's Code Practice and Remedies 1822. In our opinion, however, such a rule is not applicable to the situation now before us, and to sustain respondent's contention upon the ground that the testimony above set forth was properly received by way of impeachment, would be an unwarranted extension of any rule concerning such testimony which has been called to our attention.

Respondent also argues that the testimony would have been admissible as part of the state's case in chief, and that, if this be true, its acceptance by the court, when offered in rebuttal, does not constitute reversible error, unless prejudice is clearly shown. This rule of law is correctly stated by respondent, but we are satisfied that prejudice did result from the admission of the testimony complained of in rebuttal even though it might properly have been received as part of the state's case in chief. The testimony, however, would not have been properly received even as part of the state's case, unless, possibly, a complete record of the entire conversation between counsel for the state and appellant had for some reason been admissible. The words uttered by appellant were not a confession and evidently were not considered as a confession at the time they were made.

While the admission or rejection of such testimony is largely within the discretion of the trial court, we cannot but hold that the admission of this testimony under all the circumstances constitutes reversible error.

■ Appellant also assigns error upon the refusal of the court to declare a mistrial because of certain statements made by the prosecutor in his opening address to the jury. Counsel for appellant had offered as an exhibit in the case the information filed against appellant, stating that it was offered for one purpose only, to wit, to prove the date of its filing. In his opening address to the jury, counsel for the state used in substance the following language:

"Here is what I have to say to you: It was stipulated that they offered that information in this case for only one purpose, and that was this, that that information was not filed until the 30th of August and the crime was committed on the fifth of August. They are going to say to you that the prosecutor did not know whether Frank Posick did it or whether Mrs. Susan did it, or whether Jessberger did it, or whether you, or you, or you, did it. And they are going to say that, and they are going to try to raise in your minds that even the prosecutor did not know who did it. You wait and see if I am not right. I am prophesying something here that I know is going to happen. Friends, I am going to meet that before it is offered. I am going to say to you, friends, and I want you to believe it, that never in the history of the five or six years that I have been prosecuting attorney of this county have I ever accused any man or woman of any crime or filed an information against them until I was satisfied that they had committed the crime."

Whereupon counsel for appellant moved that the jury be discharged and the proceedings up to that time held a mistrial. The court denied appellant's motion, and instructed the jury to disregard the statement of the prosecuting attorney, at the same time indicating

that the argument as made was improper. In considering this assignment of error, the rather unusual situation existing after Mr. Susan's death and before the filing of the information against appellant, must be considered. Some question existed as to whether or not a murder had been committed at all. If a murder had been committed, whether the guilty person was appellant, or Frank Posick, or some third party, required considerable investigation and careful consideration. The prosecuting attorney, a sworn officer of the law, whose duty it was to take steps to punish the murderer, if murder had in fact been committed, naturally considered with great care the course which he should pursue. The citizens of his county had reposed in him great trust and confidence by choosing him as one of their law-enforcement officers, and looked to him to exercise careful, conscientious and discriminating judgment in any course which he should take. The statement, above quoted, made by counsel for the prosecution as part of his opening argument to the jury, was not in answer to any argument or insinuation on the part of appellant's counsel but was made, as directly stated by counsel for the state, in anticipation of some argument which he supposed would be urged by counsel for appellant.

It is important to note that the statement made was not as to any belief entertained by counsel, *from the evidence,* that appellant was guilty, but concerned his belief as to appellant's guilt before and at the time of the filing of the information. In other words, it is a statement as to the opinion of counsel for the state, based not upon the evidence before the jury, but possibly upon other facts not disclosed at the trial. This distinguishes the question presented here from the facts which were considered by this court in the case of *State v. Edelstein,* 146 Wash. 221, 262 Pac. 622.

Counsel, in the excitement of argument, cannot be held to the most careful and precise use of words and propositions which he thinks will carry conviction to the jury to whom he is presenting his case, but counsel must at all times be careful to advance arguments which are based only upon the evidence which the jury will, under the instructions of the court, consider. It is often true that arguments may be urged in reply to arguments by opposing counsel which would have been improper if advanced without such arguments having been made. It is difficult to lay down any hard and fast rule, nor do we seek to do so, and in view of the fact that a reversal of the judgment of the trial court in this case is directed, we do not decide the question as to whether or not the argument of counsel for the state constitutes reversible error. We do, however, desire to state that such an argument was improper, and for the reasons assigned should not have been advanced in counsel's opening argument under the circumstances of this case. It approaches too nearly a statement by an officer of the law, in whom the people of his county have reposed an important trust, that from information gained by him some time before the trial, concerning matters which may or may not be before the jury for their consideration from the testimony in the case, he, the prosecutor, when he filed the information, believed the defendant to be guilty. A jury might well believe that such a statement by a sworn officer of the law, in whom they have confidence, might indicate that such officer was acquainted with facts which had not been disclosed to the jury by the testimony. Such a statement throws into the scales the weight and influence of the personal character of counsel for the state, and, to some extent at least, calls upon the jury to support his judgment.

Counsel for the state contends that he did not

use the words contained in the statement of facts, but this statement, as certified by the trial judge, is controlling, and we must accept the same as containing at least the substance of the statements made in the argument complained of.

Appellant having moved for a new trial, a notice calling the same up for hearing was mailed to her counsel. This notice, being defective in point of time, was quashed by the court. Thereafter, counsel for the state served upon appellant, in person, a notice calling up, for hearing, her motion for a new trial, three days after the service of the notice upon her. On the day specified in the notice, appellant was produced in court by the sheriff, in whose custody she was; her counsel did not appear; her motion for a new trial was denied, to which she was allowed an exception. While it is true that this court has held that, in a civil case, notice of the hearing on a motion for a new trial need not be given the moving party (*State Bank of Washington v. Spokane-Columbia River R. & Nav. Co.*, 53 Wash. 528, 102 Pac. 414) we would be loath to extend this rule to a criminal case in which the life or liberty of the defendant is at stake. The action of the trial court in ruling as it did upon appellant's motion for a new trial would not, however, call for a reversal of the judgment, but merely for a remand with instructions to pass upon the motion after due notice.

For the error above pointed out, the judgment appealed from is reversed and a new trial ordered.

HOLCOMB, FRENCH, TOLMAN, MAIN, and MILLARD, JJ., concur.

PARKER, J., concurs in the result.